1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

SOUTHERN DISTRICT OF CALIFORNIA

10

CATHERINE SELLERS,

Civil No.    08cv1584-L (CAB)

11

Plaintiff,

**REPORT AND RECOMMENDATION TO:**

12

v.

**1) GRANT PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [Doc. No. 11];**

13

14

MICHAEL J. ASTRUE, Commissioner of Social Security Administration,

**2) DENY DEFENDANT'S CROSS- MOTION FOR SUMMARY JUDGMENT [Doc. No. 14]; and,**

15

16

Defendant.

**3) REMAND FOR AN AWARD OF BENEFITS**

17

18

## I.  Introduction

19

Plaintiff Catherine Sellers brings this action pursuant to 405(g)[1], to obtain judicial review of a

20

final decision of the Commissioner of Social Security ("Commissioner") denying her application for

21

Social Security Disability Insurance Benefits ("SSDI") under Title II of the Social Security Act

22

("Act"), 42 U.S.C. §§ 401, et seq.  Plaintiff has filed a motion for summary judgment.  In that

23

motion, Plaintiff argues she should have been found "disabled" under the Act and that the Appeals

24

25

[1]  42 U.S.C. § 405(g) provides:

26

Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action . . . brought in the district court of the United States. . . .  The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.  The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive.

27

28

1    Council's decision adopting Administrative Law Judge ("ALJ") Larry Parker's decision of February

2    12, 2008, denying her benefits should be reversed because the ALJ's decision is not supported by

3    substantial evidence and is based on legal error.  The Commissioner has filed a cross-motion for

4    summary judgment.  In that motion, the Commissioner argues the ALJ's decision is supported by

5    substantial evidence and is not based on legal error.

6         Pursuant to Southern District of California Local Civil Rule 7.1(d)(1), the Court finds these

7    motions may be decided on the papers and that no oral argument is necessary.  After careful

8    consideration of the papers, the administrative record, and the applicable law, this Court

9    recommends the Commissioner's decision adopting the ALJ's decision be **REVERSED**, Plaintiff's

10   motion for summary judgment be **GRANTED**, the Commissioner's cross-motion for summary

11   judgment be **DENIED**, and the case be **REMANDED** for an award of benefits.

### II.  Procedural History

13        Plaintiff applied for SSDI benefits on July 29, 2005.  (Administrative Record ("AR") at 167.)

14   Plaintiff alleged disability as of January 1, 2005 due to degenerative joint disease with bone loss,

15   morbid obesity and missing cartilage and ligament in her left knee.  (*Id*.)  On October 4, 2005, the

16   Social Security Administration ("Administration") determined Plaintiff was not disabled and denied

17   her benefits.  (AR at 113-17.)  Plaintiff requested reconsideration of her application, and the

18   Administration denied benefits again after reconsideration.  (AR at 119.)  On April 28, 2006,

19   Plaintiff requested an administrative hearing before an ALJ.  (AR at 124.)

20        On December 19, 2006, the ALJ conducted a hearing to consider the merits of Plaintiff's

21   application.  (AR at 80-100.)  This hearing resulted in her application being denied by the ALJ in a

22   written decision dated January 24, 2007.  (AR at 106-12.)  Plaintiff disagreed with the ALJ's

23   decision, and on March 23, 2007, she requested an Appeals Council Review of the decision.  (AR at

24   148-52.)  On April 27, 2007, the Appeals Council remanded the case to the ALJ with specific

25   instructions on further developing the record.  (AR at 153-54.)  The ALJ held another hearing on

26   February 12, 2008 and took additional testimony on Plaintiff's alleged disability.  (AR at 34-77.)

27   The ALJ then issued another written opinion on February 28, 2008, in which he again concluded

28   Plaintiff was not disabled under the Act.  (AR at 12-20.)  Plaintiff again disagreed with the ALJ's

1   decision and requested an Appeals Council Review of the decision.  On June 25, 2008, the Appeals

2   Council found there was no basis for granting Plaintiff's request for review and affirmed the ALJ's

3   decision, which became the final decision of the Commissioner.  (AR at 5-7.)

4          On August 28, 2008, after having exhausted all administrative remedies, Plaintiff initiated

5   this action challenging the proceedings in connection with the Commissioner adopting the ALJ's

6   decision.  [Doc. No. 1.]  On December 22, 2008, the Commissioner filed an answer to Plaintiff's

7   complaint.  [Doc. No. 7.]  On December 29, 2008, District Judge M. James Lorenz referred all

8   matters in this action to Magistrate Judge Cathy Ann Bencivengo for a report and recommendation.

9   [Doc. No. 9.]  On February 23, 2009, Plaintiff filed her motion for summary judgment, requesting

10   that the Court reverse the ALJ's decision and remand for payment of benefits.  [Doc. No. 11.]  On

11   March 30, 2009, Defendant filed his cross-motion for summary judgment, requesting that the ALJ's

12   decision be affirmed.  [Doc. No. 14.]

13          It appears that Plaintiff reapplied for benefits on November 24, 2008, and her application was

14   granted at the initial level on February 23, 2009.  Therefore, the period at issue in this case is a

15   closed period of benefits from January 1, 2005 to November 23, 2008.  (*See* Pl.'s Opp'n to Def.'s

16   Cross-Mot. for Summ. J. [Doc. No. 17].)

17                          **III.  Factual Background**

18   **A.  The First Administrative Hearing**

19          **1.  Plaintiff's testimony**

20          Plaintiff was born on October 3, 1962. (AR at 81.)  At the December 19, 2006, hearing before

21   the ALJ, Plaintiff testified that she last worked on January 10, 2005 as a pharmacy manager.  (AR at

22   90.)  She testified that she was unable to work, because she had fears of everything, including

23   people, food, medication and germs.  (AR at 85.)  She said she had issues with perfectionism,

24   symmetry and cleanliness.  (*Id.*)  She also testified that she did not like being around people and she

25   feared being judged.  (AR at 86.)  She said she felt nervous or anxious all the time and often had

26   mood swings.  (*Id.*)  She often had trouble sleeping and sometimes thought about suicide.  (AR at

27   87.)  She also testified that she did not have any friends.  (*Id.*)  She said she could stay focused for

28   about 15 minutes at a time.  (AR at 88.)  Plaintiff testified that because of her obsessive-compulsive

1   disorder, she would sometimes take 10 hours to clean the kitchen and would not stop until she was

2   done. (AR at 88-89.) She testified that she saw Dr. Alonso for her problems, and she had been

3   taking Prozac for five years, but the Prozac made her tired and lethargic. (AR at 89.)

4         When asked about her physical problems, she said she had degenerative joint disease, which

5   was very painful. (AR at 89.) She testified that she could stand about five minutes at a time. She

6   could walk less than a block before she had to stop and rest. (*Id.*) She believed she could lift and

7   carry about 20 pounds. (AR at 90.) She said that she was prescribed a brace and a cane for walking,

8   but she used a walker rather than a cane. (*Id.*) Plaintiff testified that she did not go shopping or cook

9   food, because of issues of contamination and cleanliness. (AR at 91.) She also did not have any

10  hobbies aside from smoking and drinking coffee. She saw her future as simply "waiting to die."

11  (*Id.*) Plaintiff testified that she did drive to see her doctor. (AR at 94.) She saw Dr. Alonzo once

12  every three weeks, and her therapist, Thomas DeWildt, twice a month. (AR at 95.)

13        **2. Medical evidence presented**

14            **a. Margarita Alonso, M.D.**

15        The record contains progress notes from Plaintiff's visits to Pyscare from late 2005 to late

16  2006. Sometimes Plaintiff saw Thomas DeWildt, LCSW; occasionally, she saw Margarita Alonso,

17  M.D.; and on other occasions, the notes do not indicate who saw her on that particular visit. Dr.

18  Alonso completed a Psychiatric Review Form on December 16, 2005, reporting that Plaintiff had

19  obsessive compulsive disorder and a panic disorder/social phobia with a global assessment

20  functioning scale score of 45.[2] (AR at 228.) Notes from Plaintiff's initial visit with Dr. Alonso,

21  dated December 2, 2005, indicate that she reported no suicidal or homicidal ideation, but was

22  positive for obsessive thoughts and positive for suspiciousness. (AR at 233-34.) Dr. Alonso

23  completed another psychiatric review form on December 7, 2006. (AR at 324-27.) She indicated

24  that Plaintiff had marked restriction of daily living; marked difficulties in maintaining social

---

25

26        [2] A Global Assessment of Functioning score is the clinician's judgment of the individual's overall level of functioning. It is rated with respect only to psychological, social, and occupational

27  functioning, without regard to impairments in functioning due to physical or environmental limitations. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 32 (4th

28  ed. 2000) ("DSM IV"). A GAF of 41-50 denotes "[s]erious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting)" or "any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)." DSM IV at 32-34.

functioning; moderate difficulties in maintaining concentration, persistence or pace; and four or more episodes of decompensation.  (AR at 324-27.)  Dr. Alonso assessed Plaintiff with a GAF of 55.[3]  Dr. Alonso was prescribing Prozac at the time.

### b.  Harold Konia, M.D.

Plaintiff saw Dr. Konia on September 5, 2005, for a psychiatric consultative evaluation.  (AR at 236-38.)  Dr. Konia considered Plaintiff a reliable informant.  She reported having degenerative joint disease and had started experiencing pain two years prior.  Her primary care physician was treating her with Motrin.  She also reported having panic attacks as a child and obsessive-compulsive symptoms since age 14.  (AR at 236.)  She said she had her symptoms under control until three years earlier, when she experienced a lot of stress at work.  Dr. Konia noted that a psychiatrist had diagnosed her with a depressive disorder and obsessive-compulsive disorder and started her on Prozac 40 mg.  Plaintiff said the medication helped to keep her OCD under control.  She said she took a medical leave of absence from work, but when she returned four months later, she was informed that she had been terminated.  She found another job, but also had "problems" there as well.  She was no longer in counseling, but said she was depressed and did not like to leave the house.  (*Id.*)  Dr. Konia's impressions were:  Axis I: mood disorder due to degenerative joint disease; Axis II: obsessive-compulsive traits, by history; Axis III: degenerative joint disease and hypothyroidism, by history.  (AR at 238.)  Dr. Konia found her mood to be mildly depressed, her cognitive functions intact, and he did not believe she had a mental disorder that would significantly interfere with her ability to perform simple, repetitive work-tasks.  (AR at 237.)  He found her to have a GAF of 65.[4]  (AR at 238.)

### c.  Sidney Bolter, M.D.

Dr. Sidney Bolter testified at the December 19, 2006, hearing as a medical expert.  (AR at

---

[3]  A GAF of 51-60 denotes "[m]oderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks)" or "moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers)."  DSM IV at 32-34.

[4]  A GAF of 61-70 denotes "[s]ome mild symptoms (*e.g.*, depressed mood or mild insomnia)" or "some difficulty in social, occupational, or school functioning (*e.g.*, occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM IV at 32-34.

82.)  Dr. Bolter had reviewed the record and concluded that Plaintiff had depression NOS, 12.04 other, and an anxiety disorder NOS, 12.06 other.  (AR at 84.)  He also believed there was a possible personality disorder with obsessive-compulsive traits, 12.08.  (AR at 84-85.)  He concluded that Plaintiff had moderate limitations in activity, marked limitations in social functioning, and mild limitations in repetitive tasks.  He believed she could work in a non-public setting, with minimal contact with peers and supervisors.  (AR at 85.)

### 3.  Other evidence presented

#### a.  Thomas DeWildt, LCSW

Progress notes from Psycare, Inc. indicate that Plaintiff saw Thomas DeWildt, a social worker, two to three times a month between November 2005 and September 2006.  (AR at 295-314.)  During this almost one year period, Plaintiff often reported feeling depressed, stressed, agitated and isolated.

#### b.  Marlice Siegel, mother

On September 1, 2005, Plaintiff's mother, Marlice Siegel, completed a third party function report on Plaintiff's behalf.  (AR at 193-200.)  Ms. Siegel reported that Plaintiff sat on a stool to take a shower, comb her hair and feed herself.  She reported that Plaintiff had trouble bending down to put on her shoes, shave her legs and wipe herself.  (AR at 194.)  She stated that Plaintiff could prepare sandwiches and frozen dinners, and she could do the laundry, because those were all chores that did not require a lot of standing.  (AR at 195-96.)  She indicated that Plaintiff could drive a car and occasionally took her dogs for a ride.  (AR at 196.)  She also reported that Plaintiff was able to pay bills, count change, handle a savings account and use a checkbook.  (*Id.*)  She reported that Plaintiff watched TV, worked on the computer, did puzzles and socialized with friends by telephone.  (AR at 197.)

### 4.  Mental residual functional capacity assessment

In September 2005, Robert B. Paxton, M.D. reviewed the medical records and conducted a mental residual functional capacity assessment of Plaintiff.  (AR at 239-52.)  Dr. Paxton believed Plaintiff had an affective disorder, but the condition was not severe or was not expected to last 12 months.  (AR at 239.)  The doctor believed Plaintiff was only mildly limited in her restriction of

1   activities of daily living, maintaining social functions, and maintaining concentration, persistence or

2   pace.  (AR at 249.)

3       On January 25, 2006, Emanuel H. Rosen, M.D. also reviewed the medical records and

4   conducted a mental residual functional capacity assessment of Plaintiff.  (AR at 278-80.)  Dr. Rosen

5   believed Plaintiff was not significantly limited in most areas having to do with understanding and

6   memory; sustained concentration and persistence; social interaction; and adaptation.  (*Id.*)  The only

7   areas in which the doctor believed Plaintiff was moderately limited was in her ability to understand

8   and remember detailed instructions (AR at 278), her ability to carry out detailed instructions (*id.*),

9   and her ability to interact appropriately with the general public (AR at 279).  The doctor believed

10  Plaintiff retained understanding and memory to perform one and two step repetitive work tasks.  (AR

11  at 280.)  He believed Plaintiff had adequate pace and persistence to sustain one- and two-step

12  repetitive tasks for a normal workday and work week.  He believed Plaintiff could relate in an

13  appropriate socially effective manner with coworkers and supervisors, but not with the general

14  public.  He believed she could adapt appropriately to a variety of work setting situations and

15  changes.  (*Id.*)

16      **5. Physical residual functional capacity assessment**

17      On September 26, 2005, John Meek, M.D. reviewed the medical records and conducted a

18  Physical Residual Functional Capacity Assessment of Plaintiff.  (AR at 255-63.)  Dr. Meek

19  concluded that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10

20  pounds, stand and/or walk about six hours in an eight-hour workday, and sit for six hours in an eight-

21  hour workday.  (AR at 256.)  He believed Plaintiff had unlimited ability to push and/or pull.  (*Id.*)

22  As far as postural limitations were concerned, Dr. Meek believed Plaintiff could occasionally climb,

23  balance, stoop, kneel, crouch and crawl.  (AR at 257.)  The doctor concluded that Plaintiff had no

24  visual, communicative, environmental or manipulative limitations.  (AR at 258-60.)

25      On February 3, 2006, Diane Rose, M.D. also reviewed the medical records and conducted a

26  Physical Residual Functional Capacity Assessment of Plaintiff.  (AR at 282-89.)  Dr. Rose diagnosed

27  Plaintiff with knee pain and morbid obesity.  She concluded that Plaintiff could occasionally lift

28  and/or carry 10 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about two hours in

1  an eight-hour workday, and sit for six hours in an eight-hour workday.  (AR at 283.)  She believed

2  Plaintiff had unlimited ability to push and/or pull.  (*Id.*)  As far as postural limitations were

3  concerned, Dr. Rose believed Plaintiff could occasionally climb, stoop, kneel, crouch and crawl, but

4  she could never balance.  (AR at 284.)  The doctor concluded that Plaintiff had no visual,

5  communicative, environmental or manipulative limitations, except for reaching overhead, which she

6  believed Plaintiff could only perform occasionally.  (AR at 284-86.)  Dr. Rose also believed Plaintiff

7  should avoid hazards, such as machinery and heights; walking on uneven terrain; and working at

8  unprotected heights.  (AR at 286.)

9  **6. Vocational evidence presented**

10  Nelly Katsell testified at the administrative hearing as a vocational expert.  (AR at 96-99.)

11  Ms. Katsell indicated that Plaintiff's past work experience as a pharmacy clerk, food service

12  manager and retail store supervisor were all light exertional level jobs.  (AR at 97.)  Plaintiff also

13  worked in an office as a bookkeeper, which was a sedentary exertional level.  (*Id.*)  Based upon Dr.

14  Bolter's assessment of Plaintiff's mental abilities, Ms. Katsell did not believe Plaintiff would be able

15  to perform any of her past work.  (AR at 98.)

16  The ALJ presented a hypothetical of a person with the following limitations:  a 44-year-old

17  person with at least 12 years of education or more, at the sedentary level; could lift 10 pounds

18  occasionally; less than 10 frequently; could stand or walk two out of eight hours in an eight-hour

19  workday; sitting the rest of the time; never on a ladder, rope, scaffold, all other postures occasional;

20  avoid concentrated exposure to unprotected heights and avoid walking on uneven terrain.  In

21  addition, the person would have the non-exertional limitations Dr. Bolter listed: activities moderate;

22  social marked; concentration, persistence and pace mild; simple repetitive tasks; and non-public

23  limited contact with  peers and supervisors.  (AR at 98.)  Ms. Katsell found that, given those

24  limitations, Plaintiff would be unable to return to any of her previous work.  However, there was

25  other work available for such a person, such as a cutter/paster and a lens inserter.  (*Id.*)

26  **7. ALJ's findings**

27  After a discussion of the evidence in the record, the ALJ determined that Plaintiff was not

28  entitled to SSDI benefits.  (AR at 106-12.)  In making his determination, the ALJ decided that

Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely credible. (AR at 110.) He provided several reasons for this conclusion, including: 1) the absence of objective evidence in the record, such as laboratory findings, progress notes and treatment notes from the last 12 continuous months; 2) Dr. Konia believed Plaintiff did not have a mental disorder that would significantly interfere with her ability to perform simple, repetitive work-tasks; 3) records indicate that Plaintiff's depression was not as bad in November 2006 and December 2006, when she was doing volunteer work; and, 4) state agency consultants determined that Plaintiff could perform sedentary work activity and had sufficient understanding and memory to perform one and two step repetitive tasks. (*Id.*)

The ALJ determined that Plaintiff was unable to perform any past relevant work. (AR at 110.) However, the ALJ determined that given her age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that she could perform. (AR at 111.) Based on the vocational expert's testimony, the ALJ determined that Plaintiff could make a successful adjustment to other work that exists in significant numbers in the national economy. (AR at 112.) Specifically, the ALJ determined that Plaintiff could perform unskilled, sedentary level work such as cutter/paster and lens inserter, all occupations available in the regional and national economy. (AR at 111.) Therefore, Plaintiff was not eligible for SSDI benefits. (AR at 112.)

**B. Remand from the Appeals Council**

Plaintiff requested review of the ALJ's decision from the Appeals Council, and on April 27, 2007, the Appeals Council granted review and remanded the case to the ALJ for further development of the record and a new decision. (AR at 153-54.) The Appeals Council found that the record included a medical opinion by Plaintiff's treating psychiatrist, Dr. Alonso, that Plaintiff had marked limitations in the ability to perform a number of significant, work-related activities. (AR at 153.) The medical expert had testified at the administrative hearing that Dr. Alonso's opinion was not supported by appropriate progress notes or objective testing. The Appeals Council determined that Dr. Alonso should be re-contacted for additional documentation, if any, to support her opinion. In

1 addition, the Appeals Council found that the ALJ's decision did not contain an adequate evaluation

2 of Plaintiff's subjective complaints.  While the ALJ looked at the medical evidence, the Appeals

3 Council found that he had not sufficiently addressed the non-medical criteria for evaluating

4 subjective complaints, particularly Plaintiff's current daily activities.  In addition, the ALJ had not

5 addressed a lay statement from Plaintiff's mother about Plaintiff's symptoms, behavior and

6 activities.  (*Id.*)

7 **C. The Second Administrative Hearing**

8       As a result of the remand from the Appeals Council, the ALJ held a second administrative

9 hearing on February 12, 2008.  (AR at 34-77.)

10     **1. Plaintiff's testimony**

11       Plaintiff testified again at the February 12, 2008, hearing and stated that she was unable to

12 work, because she had extreme panic attacks, was not able to leave her room most of the time, was

13 depressed most of the time, cried a lot, had trouble doing daily tasks, had a lot of OCD issues and

14 was afraid of people.  (AR at 39.)  She testified that she often slept during the day and stayed awake

15 at night, because she felt safer at night when it was quiet and dark.  (AR at 40.)  She stated that she

16 did not watch TV, read or do puzzles anymore.  (*Id.*)  She said that she got panic attacks when she

17 had to leave the house.  She sweated, got hot and cold, and her heart would beat very fast.  (AR at

18 41.)  To prepare herself for the administrative hearing, she said that she spent three or four days in

19 "self-talk," telling herself that she was going to be okay.  She said she did the same thing before

20 doctor's appointments, but sometimes she was still not able to go and would have to miss the

21 appointment.  (*Id.*)

22       She stated she did not leave the house for any other purpose than to go to her doctor's

23 appointments or the administrative hearing.  (AR at 42.)  She said she did not go shopping, have any

24 friends or do anything with other people.  (*Id.*)  She said she felt "stupid and inferior" when she was

25 around other people, and she did not want them to see that her hands were dried out and ask her

26 questions about how often she washed her hands.  (AR at 43.)  She said she had a lot of fear of food

27 contamination, so it took her a long time to prepare food, because she had to sterilize her kitchen

28 first.  (AR at 43-44.)  If some food had already been opened before she touched it, she could not eat

it.  (AR at 43.)  She said she could only take her Prozac and thyroid medication, but could not take her cholesterol medication, high blood pressure medication, pain medication or other psychiatric medication prescribed to her.  (AR at 44.)  She said sometimes the process of taking medication would take her all day, because she could not swallow it or it would get stuck in her throat and it would burn.  (AR at 45.)  She said she had been dealing with these issues since she was 14, but it got really, really bad around 2001, when "a lot of bad things happened to me."  (*Id.*)  She said she was able to work in the past, because she spent a lot of time hiding her problems, such as the fact that she could not spell, but things got to a point where she could not hide anymore.  (AR at 45-46.)

### 2.  Medical evidence presented

#### a.  Margarita Alonso, M.D.

Dr. Alonso submitted additional treatment records dated from January 18, 2007 to January 17, 2008.  (AR 359-73.)  During this time period, it appears Plaintiff saw Dr. Alonso about once a month.  The treatment notes detail depression, isolation and OCD behavior related to food and contamination.  On January 17, 2008, Dr. Alonso completed a psychiatric review form, reporting that Plaintiff had bipolar disorder, depression and obsessive compulsive disorder and hypothyroidism.  (AR at 366.)  She assessed Plaintiff's current GAF at 50.  She also reported that Plaintiff's condition interfered with her medication compliance.  (AR at 367.)  She anticipated that Plaintiff would be absent from work more than three times a month due to her medical condition.  (AR at 368.)

#### b.  Jaga Nath Glassman, M.D.

Dr. Glassman interviewed Plaintiff on September 25, 2007 and conducted a psychiatric disability evaluation.  (AR at 332-37.)  During the interview, Plaintiff reported having OCD due to her obsession with germs and contamination.  (AR at 333.)  At times, she would wash her hands 15 times an hour.  She would often stay up at night and clean for 8-12 hours, because she could not stop.  (*Id.*)  Her panic attacks were mostly due to her fears about germs and contamination.  She avoided going out of the house, and she feared swallowing her pills, because she worried that they were contaminated.  Plaintiff reported that her grooming was not that good, and she could go three weeks without a shower or brushing her teeth, because she did not have the energy to do it.  (AR at 334.)

Dr. Glassman observed that despite Plaintiff having reported longstanding symptoms of OCD, anxiety and mood lability since the age of 14, she was able to work up until she lost her job in January 2005.  (AR at 336.)  Dr. Glassman also observed that Plaintiff showed no significant mental status findings during the examination, except a dramatic flair and a clear adoption of a sick/victim role.  Dr. Glassman sensed that Plaintiff exaggerated and put in poor effort on the cognitive tests he performed on her.  (*Id.*)  He believed she was capable of behaving in a socially-appropriate manner, could get along adequately with others, could adopt to some degree of changes and stresses in a workplace setting, could follow simple and complex instructions and could maintain concentration, persistence and pace for simple, repetitive tasks.  (AR at 337.)

**c. Sidney Bolter, M.D.**

Dr. Bolter testified again at the February 12, 2008 administrative hearing.  He noted that the newly-submitted treatment notes were not very detailed.  (AR at 53.)  A number of the mental status examinations were "check-offs" and were inadequate, because they were conclusory.  (AR at 54.)  He did not find a description of a truly depressed patient in the treatment notes.  (*Id.*)  He believed the adequate mental status evaluations were completed by Dr. Konia and Dr. Glassman.  (AR at 57.)  Dr. Bolter noted that the newest records indicated that Plaintiff had improvement in her symptoms.  He also noted that Plaintiff was only seen about once a month, and a patient as ill as Plaintiff claimed to be would be seen more often.  (*Id.*)

**3. Other evidence presented**

**a. Thomas DeWildt, LCSW**

Mr. DeWildt submitted treatment notes from October 26, 2006 to June 25, 2007.  (AR 347-57.)  During this time period, Plaintiff saw Mr. DeWildt about once a month.  In a letter dated July 26, 2007, Mr. DeWildt reported that he had been working with Plaintiff one and off since November 2001.  (AR 339-40.)  He believed that she was an "enigma in many ways."  Although she came across as sounding rational and capable, Mr. DeWildt believed Plaintiff was in reality quite mentally ill with multiple diagnoses.  (AR at 339.)  First, Mr. DeWildt believed Plaintiff to have bipolar I, mixed episodes diagnosis.  When she was manic, she would take on too many responsibilities.  During her depression stages, she isolated herself in her bedroom for days or weeks at a time.  Mr.

1  DeWildt also believed Plaintiff to have severe obsessive-compulsive disorder.  As a result, she had

2  bizarre rituals related to food due to her fear of contamination, she did not take her medication, and

3  she had to take liquid Prozac.  (*Id.*)  Mr. DeWildt also reported that Plaintiff had been diagnosed

4  with panic disorder with agoraphobia.  Mr. DeWildt believed Plaintiff's judgment and perceptions

5  were impaired such that she was unable to seek or hold employment.  He reported that psychotherapy

6  had not resulted in any kind of successful breakthrough of her symptoms.

7  **4. Vocational evidence presented**

8  Nelly Katsell testified again at the second administrative hearing as a vocational expert.  (AR

9  at 71-76.)  The ALJ first asked Ms. Katsell, if she took Plaintiff's testimony as true, whether Plaintiff

10  would be able to perform her past relevant work.  Ms. Katsell indicated that she would not.  The ALJ

11  then asked whether she would be able to perform work at any exertional level, and Ms. Katsell again

12  responded that she would not.  (AR at 71.)

13  The ALJ then presented the following hypothetical: an individual of approximately 45 years

14  of age with at least 12 years of education, at the sedentary exertional level.  (AR at 72.)  In addition,

15  the hypothetical assumed the non-exertional mental limitations that Dr. Bolter espoused:  moderate

16  activities of daily living, moderate as to social, and mild as to concentration, persistence and pace.

17  (*Id.*)  Ms. Katsell indicated that such a person would not be able to perform Plaintiff's past relevant

18  work experience, but there were jobs available that the person could perform.  (AR at 73.)  Examples

19  of such jobs were addresser (2,800 regionally, 200,000 nationally); polisher, eyeglass frames (1,000

20  regionally, 300,000 nationally); and lens inserter (1,500 regionally, 500,000 nationally).  (AR at 73-

21  74.)

22  Plaintiff's attorney then asked Ms. Katsell if, as Dr. Alonso believed, Plaintiff would miss

23  more than three days of work a month, due to obsessive-compulsive behavior, whether she would be

24  able to do any work.  Ms. Katsell responded that she could miss one day of work a month, but more

25  than that, she would not be able to do any work.  (AR at 76.)

26  **5. ALJ's findings**

27  Following the second administrative hearing, the ALJ issued a second opinion in which he

28  again found that Plaintiff was not disabled under the Act.  (AR at 12-20.)  The ALJ found that

1  Plaintiff had not engaged in substantial gainful activity since January 1, 2005.  (AR at 14.)  Then, he

2  found that Plaintiff had the following severe impairments:  degenerative joint disease, chronic

3  depression and morbid obesity.[5]  (Id.)  Despite Plaintiff's various impairments, the ALJ found that

4  these impairments, alone or in combination, did not meet or equal an impairment listed in the

5  regulations.  (AR at 15.)  The ALJ reasoned that no physician had opined that Plaintiff's condition

6  met or equaled any listing, and the state agency physicians opined that they did not.  The ALJ found

7  that Plaintiff had the following limitations:  moderate restriction of activities of daily living; marked

8  difficulties in maintaining social functioning; mild difficulties in maintaining concentration,

9  persistence or pace; and no evidence of episodes of decompensation.  The ALJ determined that

10  Plaintiff retained the residual functional capacity to perform the job duties of unskilled, sedentary

11  level work activity, involving simple repetitive tasks with no public contact and minimum contact

12  with supervisors and co-workers.  (Id.)

13       In making his decision, the ALJ found the functional limitations set out by Dr. Alonso were

14  not credible, because Plaintiff was not compliant with her psychiatric medications.  (AR at 16.)

15  Plaintiff herself admitted to taking only Prozac but not the other psychiatric medications given to

16  her.  As a result, her depression was exacerbated by her non-compliance.  The ALJ found the

17  decision to take Prozac and not other medications was a conscious election on Plaintiff's part.  In

18  reviewing the report from Plaintiff's mother, the ALJ found that it did not establish that Plaintiff was

19  disabled.  (Id.)

20       As for Plaintiff's subjective testimony, the ALJ found that her statements regarding the

21  intensity, persistence and limiting effects of these symptoms was not entirely credible.  He gave a

22  number of reasons for his conclusion:  1) the record was absent objective evidence, specifically,

23  clinical signs and laboratory findings, progress notes and treatment notes to establish a severe

24  impairment lasting or expected to last 12 continuous months; 2) Dr. Konia believed Plaintiff did not

25  have a mental disorder that would significantly interfere with her ability to perform simple, repetitive

26

27       [5]  In his first opinion, the ALJ concluded that Plaintiff had the following severe impairments:
degenerative joint disease, hypertension, major depression, panic disorder with agoraphobia, obsessive-
28  compulsive disorder, and a bipolar disorder.  (AR at 108.)  It is unclear why the ALJ's conclusions about
Plaintiff's impairments changed so drastically.

08cv1584

work tasks; 3) the records indicated that Plaintiff's depressed mood was not as bad on November 9, 2006, and on December 7, 2006, Plaintiff reported that she was doing volunteer work; 4) recent medical records from Dr. Alonso reported that Plaintiff had improved as a result of taking her medication; 5) on January 17, 2008, Dr. Alonso reported that Plaintiff was not taking some of her psychiatric medications, which exacerbated her depression; 6) Dr. Bolter testified that the claimant's depression resulted in moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no evidence of episodes of decompensation; 7) on a functional report, Plaintiff indicated she was able to take care of her personal care, dress and feed herself, prepare food, do laundry, take care of her pets and drive a car.  She said she could pay bills, use a checking account and handle a savings account.  She also indicated she watched TV, talked on the phone with friends, worked on the computer, and did puzzles.  (AR at 17-18.)

The ALJ determined that Plaintiff retained the residual functional capacity to perform unskilled, sedentary level occupations available in the regional and national economy, such as a cutter/paster (2,000 regionally, 750,000 nationally); polisher, eyeglass frames (1,000 regionally, 300,000 nationally); and lens inserter (2,500 regionally, 1.3 million nationally).  (AR at 19.) Because Plaintiff could perform and sustain work in jobs existing in significant numbers in the national economy, the ALJ concluded Plaintiff was not "disabled" within the meaning of the Act. (AR at 19.)

## IV.  Discussion

### A.  Legal Standard

The Social Security Act authorizes payment of SSDI benefits to individuals who have an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The disabling impairment must be so severe that the claimant is not only unable to do her previous work, but, considering age, education, and work experience, cannot engage in any kind of substantial gainful work that exists in the national economy.  42 U.S.C. § 423(d)(2)(A).

The Commissioner makes this assessment by a five-step analysis.  First, the Commissioner determines whether a claimant is engaged in "substantial gainful activity."  If so, the claimant is not disabled.  20 C.F.R. § 404.1520(b).  Second, the Commissioner determines whether the claimant has a "severe impairment or combination of impairments" that significantly limits the claimant's physical or mental ability to do basic work activities.  If not, the claimant is not disabled.  20 C.F.R. § 404.1520(c).  Third, the medical evidence of the claimant's impairment is compared to a list of impairments that are presumed severe enough to preclude work; if the claimant's impairment meets or equals one of the listed impairments, benefits are awarded.  20 C.F.R. § 404.1520(d).  Fourth, if the impairment meets or equals one of the listed impairments, the Commission determines whether the claimant can do his past relevant work.  If the claimant can do his past work, benefits are denied.  20 C.F.R. § 404.1520(e).  If the claimant cannot perform her past relevant work, the burden shifts to the Commissioner.  In step five, the Commissioner must establish that the claimant can perform other work.  20 C.F.R. § 404.1520(f).  If the Commissioner meets this burden and proves that the claimant is able to perform other work that exists in the national economy, then benefits are denied.

Sections 405(g) and 421(d) of the Social Security Act allow unsuccessful applicants to seek judicial review of a final agency decision of the Commissioner.  42 U.S.C. §§ 405(g), 421(d).  The scope of judicial review is limited, however, and the Commissioner's denial of benefits "will be disturbed only if it is not supported by substantial evidence or is based on legal error."  *Brawner v. Sec'y of Health & Human Servs.*, 839 F.2d 432, 433 (9th Cir. 1988) (citing *Green v. Heckler*, 803 F.2d 528, 529 (9th Cir. 1986)).

Substantial evidence means "more than a mere scintilla" but less than a preponderance. *Sandqathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997).  "[I]t is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).  The court must consider the record as a whole, weighing both the evidence that supports and detracts from the Commissioner's conclusions. *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988).  If the evidence supports more than one rational interpretation, the court must uphold the ALJ's decision. *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984).  When the evidence is inconclusive, "questions of

credibility and resolution of conflicts in the testimony are functions solely of the Secretary." *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982).

The ALJ has a special duty in social security cases to fully and fairly develop the record in order to make an informed decision on a claimant's entitlement to disability benefits. *DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir. 1991). Because disability hearings are not adversarial in nature, the ALJ must "inform himself about the facts relevant to his decision," even if the claimant is represented by counsel. *Id.* (quoting *Heckler v. Campbell*, 461 U.S. 458, 471 n.1 (1983)).

Even if the reviewing court finds that substantial evidence supports the ALJ's conclusions, the court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing the evidence and reaching his or her decision. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978). Section 405(g) permits a court to enter a judgment affirming, modifying, or reversing the Commissioner's decision. 42 U.S.C. § 405(g). The reviewing court may also remand the matter to the Commissioner for further proceedings. *Id.*

**B. Plaintiff's Claim**

Plaintiff asserts two grounds for reversal of the ALJ's decision. First, she asserts that the ALJ failed to provide specific and legitimate reasons for rejecting her treating psychiatrist's opinion. Second, she argues that the ALJ's decision is not supported by substantial evidence. Based upon these two grounds, Plaintiff contends that the Court can now find her disabled and award benefits. The Court considers each of Plaintiff's arguments below.

**1. ALJ's rejection of Dr. Alonso's opinion**

Plaintiff argues that the ALJ failed to provide specific and legitimate reasons for rejecting the opinion of Dr. Margarita Alonso, Plaintiff's treating psychiatrist. (Pl.'s Mem. 18.) Plaintiff argues that Dr. Alonso treated her for more than two years, with treatment notes and psychiatric review forms in the record, and prescribed various psychiatric medications for Plaintiff's condition. (*Id.* at 19.) Plaintiff contends that Dr. Alonso consistently reported that Plaintiff had marked difficulties with daily living and social functioning, but the ALJ rejected Dr. Alonso's opinions without specific and legitimate reasons.

The Ninth Circuit distinguishes among the opinions of three types of physicians: (1) those

1   who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant

2   (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining

3   physicians). *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). The ALJ must give the medical

4   opinion of a treating physician "special weight," because a treating physician "is employed to cure

5   and has a greater opportunity to know and observe the patient as an individual." *Andrews*, 53 F.3d at

6   1041 (citation omitted); *Rodriguez v. Bowen*, 876 F.2d 759, 761 (9th Cir.1989). However, the

7   treating physician's opinion on the ultimate issue of disability is not necessarily conclusive. *Matney*

8   *v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992). The ALJ may disregard the treating physician's

9   opinion if the ALJ sets forth "specific, legitimate reasons . . . based on substantial evidence."

10  *Rodriguez*, 876 F.2d at 762. The ALJ can meet this burden of substantial evidence by "providing a

11  detailed summary of the facts and conflicting clinical evidence, along with a reasoned interpretation

12  thereof." *Id.* Finally, the ALJ need not accept an opinion of a treating physician if it is

13  "conclusionary and brief and unsupported by clinical findings." *Matney*, 981 F.2d at 1019.

14        Here, the record indicates that Plaintiff had been going to Psycare, Inc. from at least late 2005

15  to early 2008. During the period between September 2006 and January 2008, treatment notes

16  indicate Plaintiff saw Dr. Alonso about once a month. (AR at 358-73.) Dr. Alonso was the doctor

17  who prescribed Prozac and other psychiatric medications to Plaintiff. Dr. Alonso diagnosed Plaintiff

18  with bipolar disorder, currently depressed; and obsessive compulsive disorder, severe. (AR at 364.)

19  The treatment notes indicate that Plaintiff had trouble swallowing pills, so she continued to have

20  depression and only had mild improvements of her OCD symptoms. (*Id.*) Throughout the treatment

21  notes, Dr. Alonso noted impaired functioning in the areas of occupation, social and familial. As late

22  as January 2008, Dr. Alonso noted a marked limitation in activities of daily living; maintaining

23  social functioning; and maintaining concentration, persistence or pace. (AR at 369.) She believed

24  that Plaintiff's impairment had lasted or could be expected to last at least 12 months. (AR at 368.)

25  The ALJ provided two reasons for rejecting Dr. Alonso's opinion: 1) Dr. Alonso did not provide

26  mental status evaluations or objective evidence to support her findings; and 2) Plaintiff was non-

27  compliant with taking her medications. (AR at 16.) The Court finds neither of these reasons to be

28  specific, legitimate reasons supported by substantial evidence.

1    The first reason the ALJ gave for rejecting Dr. Alonso's opinion was that Dr. Alonso did not

2    provide any objective evidence to support her findings.  During the second administrative hearing,

3    Dr. Bolter, the medical expert, noted that Dr. Alonso's treatment notes were not very detailed.  (AR

4    at 53.)  He and the ALJ spent a great deal of time criticizing them for being "check-offs."  However,

5    in addition to providing numbers (1, 2, or 3) to mark the severity of Plaintiff's symptoms during each

6    visit, Dr. Alonso also made many handwritten notes.  On September 14, 2006, she noted that

7    Plaintiff isolated herself, worried about everything, slept during the day, and said she had no suicidal

8    ideations "not this week."  (AR at 358.)  On January 18, 2007, Dr. Alonso noted that Plaintiff was

9    feeling depressed, stayed in her room and had panic attacks daily, which were triggered by washing

10   her hands.  (AR at 359.)  On April 5, 2007, Dr. Alonso noted that Plaintiff was dealing with her sick

11   mother, washed her clothes twice a day and sterilized her utensils.  Dr. Alonso also made a note that

12   she was considering increasing Plaintiff's Prozac.  (AR at 361.)  On May 17, 2007, Dr. Alonso noted

13   that Plaintiff described her moods as a "roller coaster," she had panic attacks everyday, and she was

14   so irritable, she often yelled at people.  (AR at 362.)  On June 25, 2007, Dr. Alonso noted that

15   Plaintiff's OCD was worse, that she had some stressors in her life, because her brother had been

16   hospitalized.  She also noted that the severity of many of Plaintiff's symptoms had increased to

17   moderate or severe.  (AR at 363.)

18   On July 2, 2007, Dr. Alonso put together a handwritten summary of Plaintiff's treatment,

19   describing in detail Plaintiff's depression and OCD, which interfered with her functioning at all

20   levels.  (AR at 364.)  She diagnosed Plaintiff as having bipolar disorder and severe obsessive

21   compulsive disorder.  Her treatment plan for Plaintiff was to continue with therapy and management

22   of her medication, although Dr. Alonso noted that her OCD symptoms interfered with her taking her

23   medication.  (*Id.*)  On January 17, 2008, Dr. Alonso completed a Psychiatric Review Form, which

24   contained some "check-boxes" but also contained areas for her to make comments.  (AR at 366-69.)

25   She marked boxes to indicate that Plaintiff had feelings of guilt/worthlessness, had difficulty

26   thinking or concentrating, had oddities of thought, was emotionally withdrawn or isolated, and had

27   severe obsessions or compulsions.  (AR at 366.)  Her handwritten notes report that Plaintiff suffered

28   from severe bipolar depression and OCD, two conditions that prevented her from functioning

1  adequately in the home and at work.  (AR at 367.)  She also reported that Plaintiff's condition

2  interfered with her medication compliance, because she had an obsession with swallowing pills, and

3  could not take mood stabilizers for that reason.  (*Id.*)  She believed that Plaintiff's condition would

4  cause her to miss work more than three times a month.  (AR at 368.)  She explained that Plaintiff's

5  OCD behavior caused her to go through daily rituals that could take many hours of the day.  (*Id.*)

6         The ALJ's conclusion that Dr. Alonso did not provide mental status evaluations or objective

7  evidence to support her findings is not supported by the evidence in the record.  "Courts have

8  recognized that a psychiatric impairment is not as readily amenable to substantiation by objective

9  laboratory testing as is a medical impairment and that consequently, the diagnostic techniques

10  employed in the field of psychiatry may be somewhat less tangible than those in the field of

11  medicine."  *Lebus v. Harris*, 526 F.Supp. 56, 60 (N.D. Cal. 1981) (citations omitted).  "Mental

12  disorders cannot be ascertained and verified as are most physical illnesses, for the mind cannot be

13  probed by mechanical devices in order to obtain objective clinical manifestations of mental illness.

14  A strict reading of the statutory requirement that an impairment be 'demonstrable by medically

15  acceptable clinical and laboratory diagnostic techniques' is inappropriate in the context of mental

16  illnesses."  *See Hartman v. Bowen*, 636 F. Supp. 129, 132 (N.D. Cal. 1986) (citations omitted).

17  Rather, when mental illness is part of a disability claim, "clinical and laboratory data may consist of

18  the diagnoses and observations of professionals trained in the field of psychopathology.  The report

19  of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric

20  methodology or the absence of substantial documentation, unless there are other reasons to question

21  the diagnostic technique."  *See Christensen v. Bowen*, 633 F.Supp. 1214, 1220-21 (N.D. Cal. 1986)

22  (citation omitted); *see also Hartman*, 636 F. Supp. at 132; *Day v. Weinberger*, 522 F.2d 1154, 1156

23  (9th Cir. 1975) ("[d]isability may be proved by medically-acceptable clinical diagnoses, as well as by

24  objective laboratory findings"); *Montijo v. Sec'y of Health & Human Servs.*, 729 F.2d 599, 601 (9th

25  Cir. 1984) (while objective diagnoses and observations are the most important parts of the

26  physicians' reports, the ALJ's reliance on the inability of the physicians to support their findings

27  with objective laboratory findings does not constitute a legally sufficient reason for rejecting their

28  conclusions) (citing *Day*, 522 F.2d at 1156-57); *Embrey v. Bowen*, 849 F.2d 418, 421-23 (9th Cir.

1   1988) (merely to state that a medical opinion is not supported by enough objective findings "does not

2   achieve the level of specificity our prior cases have required, even when the objective factors are

3   listed seriatim.").

4        Here, the record contains not only check-boxes but also handwritten notes made by Dr.

5   Alonso.  As a trained professional, she assessed Plaintiff's mental status during each visit and made

6   notes where necessary of her observations.  Where disability due to mental impairment is involved,

7   the need for longitudinal evidence is vital.  20 C.F.R. part 404, subpart P, app. 1, § 12.00(D)(2).

8   According to the Psycare, Inc. records, Plaintiff was visiting Pyscare as early as 2001.  (AR at 341.)

9   She returned on November 14, 2005.  (*Id.*)  While the treatment notes from November 2005 to June

10  2007 indicate that she was seen primarily by Thomas DeWildt, a social worker, Mr. DeWildt

11  referred her to Dr. Alonso in September 2006.  From the period September 2006 to January 2008, it

12  appears, she saw Dr. Alonso about once a month.  During this period of treatment, the treating

13  physician, Dr. Alonso, had the benefit of observing, assessing, and treating Plaintiff at regular

14  intervals.  Dr. Alonso prescribed Prozac and other psychiatric medications, and at one point

15  considered increasing her treatment of Prozac.  The treatment notes from Psycare provide a

16  longitudinal assessment of Plaintiff's psychiatric condition.  The ALJ's conclusion that Dr. Alonso's

17  opinion was not supported by any objective medical evidence oversimplifies and discounts the value

18  of the longitudinal history provided by the totality of the treatment records.  This Court finds that the

19  treatment records amply support Dr. Alonso's opinion.  Therefore, the ALJ committed legal error by

20  not taking Dr. Alonso's opinion into account.

21       The ALJ's second reason for rejecting Dr. Alonso's opinion was that Plaintiff was non-

22  compliant with taking her medication.  (AR at 16.)  The ALJ determined that Plaintiff knew if she

23  did not take her thyroid medication, it would exacerbate her depression, and her decision to take the

24  Prozac but not the thyroid medication was a "conscious election" on Plaintiff's part.  The ALJ

25  concluded that the functional limitations set out by Dr. Alonso were "not credible due to the

26  claimant's noncompliance taking all of her psychiatric medications."  (*Id.*)  This is also not a specific

27  and legitimate reason supported by substantial evidence, because the evidence in the record indicates

28  that Plaintiff's failure to take her medications were a result of her OCD, not a "conscious election."

1    Dr. Alonso noted numerous times in her treating notes that Plaintiff had difficulties swallowing her

2    medication due to her obsession with the pills being contaminated.  For this reason, Dr. Alonso

3    prescribed a liquid Prozac, which Plaintiff was able to take.

4         An ALJ may find that a claimant's refusal of a recommended course of treatment, or her

5    failure to take a prescribed medication that would alleviate the alleged disabling symptoms, supports

6    finding a claimant not credible.  20 CFR § 404.1530(a) ("In order to get benefits, you must follow

7    treatment prescribed by your physician if this treatment can restore your ability to work."); 20 CFR

8    404.1530(b) (If you do not follow the prescribed treatment without a good reason, we will not find

9    you disabled."); *see also Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996) (ALJ may consider a

10   claimant's compliance with her prescribed treatment in assessing the severity of a claimant's

11   symptoms); *Lewis v. Apfel*, 236 F.3d 503, 513-14 (9th Cir. 2001) (ALJ properly rejected a treating

12   physician's letter that the claimant's seizures had not been fully controlled where other evidence in

13   the record suggested that the claimant had not consistently complied with his treatment regime).  In

14   evaluating a claimant's reasons for failing to follow prescribed treatment, the ALJ must consider

15   (among other things) the claimant's physical and mental limitations.  *See* 20 C.F.R. § 404.1530(c).

16        Here, Plaintiff testified that she had trouble swallowing pills due to her obsession with them

17   being contaminated.  (AR at 44.)  Plaintiff's testimony is also supported by Dr. Alonso's treating

18   notes.  *See Brashears v. Apfel*, 73 F. Supp. 2d 648, 652 (W.D. La. 1999) (remanding where evidence

19   from mental health provider show plaintiff's non-compliance may be beyond her control); *see also*

20   *Sharp v. Bowen*, 705 F. Supp. 1111, 1123-24 (W.D. Pa. 1989) (diabetic who injected insulin into his

21   pillow and ate junk food rather than prescribed diet did so because of severe personality disorder,

22   providing justifiable cause for non-compliance).  "The 'reasonable man' standard . . . is clearly not

23   applicable to [mentally ill claimants]. . . .  To deny this person benefits . . . because he is not acting

24   under a 'reasonable fear' mocks the idea of disability based on mental impairments."  *Benedict v.*

25   *Heckler*, 593 F. Supp. 755, 761 (E.D.N.Y. 1984).  The ALJ did not explain why Plaintiff's mental

26   condition was not "a good reason" within the meaning of the regulations.  He simply concluded that

27   failure to take her medication was a "conscious election," and such conclusion is not supported by

28   the substantial evidence and was based on legal error.

**2. Substantial evidence to support the ALJ's decision**

Plaintiff also argues that the ALJ's decision is not supported by substantial evidence.  (Pl.'s Mem. 22.)  Plaintiff contends that the ALJ:  1) failed to clearly identify evidentiary support for his ultimate conclusions; 2) failed to evaluate the opinions of Plaintiff's therapist, Thomas DeWildt; and 3) relied on vocational evidence that was inconsistent with the functional limitations he adopted.  (Pl.'s Mem. 22.)

Substantial evidence means more than a scintilla, but less than a preponderance; it is evidence that a reasonable person might accept as adequate to support a conclusion.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citing *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion."  *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1996).  "If the evidence can support either affirming or reversing the ALJ's conclusion," the reviewing court "may not substitute its judgment for that of the ALJ."  *Robbins*, 466 F.3d at 882.  Even if the reviewing court determines that the ALJ's conclusions are supported by substantial evidence, the court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing the evidence in reaching his decision.  *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004).

In this case, the ALJ cites to the opinion of Dr. Bolter, the medical expert, in reaching his conclusion that Plaintiff was not disabled under the Act.  (AR at 17.)  Dr. Bolter testified at the first administrative hearing that Plaintiff had depression, an anxiety disorder and possibly a personality disorder with obsessive-compulsive traits.  (AR at 84-85.)  He concluded that Plaintiff had moderate limitations in activity, marked limitations in social functioning and mild limitations in repetitive tasks.  He believed she should work in a non-public setting, with minimal contact with peers and supervisors.  (AR at 85.)  At the second administrative hearing, he testified that the newly submitted treatment notes were inadequate, because they were "check-offs."  Dr. Bolter also noted, however, that he could not consider any of Plaintiff's testimony or the opinion of Plaintiff's therapist, Thomas DeWildt, in reaching his conclusions.  (AR at 52.)  The ALJ also considered the opinions of state

1  agency medical consultants, who reviewed the evidence in the record and then completed forms on

2  what they believed to be Plaintiff's physical and mental limitations. (AR at 17.)  Finally, the ALJ

3  considered the opinion of Dr. Konia, a doctor who met with Plaintiff on September 5, 2005, and

4  conducted a psychiatric consultative evaluation.  Specifically, the ALJ relied on Dr. Konia's opinion

5  that Plaintiff did not have a mental disorder that would significantly interfere with her ability to

6  perform simple, repetitive tasks.  (*Id.*)

7       The ALJ, however, failed to consider the opinion of Dr. Glassman who met with Plaintiff on

8  September 25, 2007 and conducted a psychiatric disability evaluation.  (AR at 332-37.)  Dr.

9  Glassman's Axis I diagnoses were obsessive-compulsive; panic disorder, with phobic avoidance;

10 mood disorder, not otherwise specified; pain disorder with medical and psychological factors.  (AR

11 at 336.)  As discussed above, the ALJ also failed to consider the opinion of Plaintiff's treating

12 physician, Dr. Alonso.  Further, the ALJ failed to consider the opinion of Plaintiff's therapist,

13 Thomas DeWildt, LCSW.  The ALJ does not discuss Mr. DeWildt's treatment notes or opinion at all

14 in his written opinion, but there was some discussion at the second administrative hearing that Mr.

15 DeWildt was a non-acceptable medical source.  (AR at 52-53.)

16      In a disability proceeding, the ALJ must consider the opinions of acceptable medical sources.

17 20 C.F.R. §§ 404.1527(d).  Acceptable medical sources include licensed physicians and

18 psychologists.[6]  20 C.F.R. §§ 404.1513(a).  In addition to evidence from acceptable medical sources,

19 the ALJ may also use evidence from "other sources" including nurse practitioners, physicians'

20 assistants, therapists, teachers, social workers, spouses and other non-medical sources.  20 C.F.R. §§

21 404. 1513(d).  Social Security Ruling 06-3p summarizes regulations providing that only an

22 acceptable medical source can:  (1) establish the existence of a medically determinable impairment;

23 (2) provide a medical opinion; and (3) be considered a treating source.  Evidence from other sources

24 can be used to determine the severity of an impairment and how it affects the ability to work.  S.S.R.

25 06-3p; 20 C.F.R. §§ 404.1513(d).  In evaluating the evidence, the ALJ should give more weight to

26 the opinion of an acceptable medical source than that of an "other source."  20 C.F.R. §§ 404.1527;

27

28      [6]  Other acceptable medical sources are licensed podiatrists and optometrists and qualified
speech-language pathologists, in their respective areas of specialty only.  20 C.F.R. §§ 404.1513(a).

1    *Gomez v. Chater*, 74 F.3d 967, 970-71 (9th Cir. 1996).  However, the ALJ is required to "consider

2    observations by non-medical sources as to how an impairment affects a claimant's ability to work."

3    *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987).  An ALJ must give reasons "germane" to

4    "other source" testimony before discounting it. *Dodrill v. Shalala*, 12 F.3d 915 (9th Cir. 1993).

5    In this instance, the ALJ gave no reason for not considering Mr. DeWildt's treatment notes or

6    opinions.  Treatment notes indicate that Plaintiff saw Mr. DeWildt for therapy two to three times a

7    month between November 2005 to June 2007.  (AR at 295-357.)  During her therapy with Mr.

8    DeWildt, she often reported feeling stressed and depressed.  In May 2006, Mr. DeWildt noted that

9    Plaintiff had trouble swallowing her thyroid medication, that it took about an hour to take it.  (AR at

10   305.)  Mr. DeWildt also noted that Plaintiff had concerns that her family believed she was stupid.

11   (*Id.*)  In June 2006, she reported that she could not go back to a job, because she could not tolerate

12   another failure.  (AR at 308.)  In June 2006, Mr. DeWildt also noted that Plaintiff continued to be

13   depressed and had severe self-reproach and self-hate.  (AR at 307.)  In July 2006, she reported

14   feeling better and was doing political volunteer work and took on two dogs to care for.  (AR at 309-

15   10.)  In September 2006, she reported that she was again feeling depression and anxiety.  (AR at

16   314.)  In October 2006, she reported going to the library to help kids with their homework, until a

17   mother criticized her, which made her want to quit.  (AR at 347.)  In March 2007, Mr. DeWildt again

18   noted Plaintiff's profound OCD and her struggles with agoraphobia.  (AR at 353.)  She had fears of

19   contamination and had to sterilize everything before she started cooking.  (*Id.*)

20   In a letter dated July 26, 2007, Mr. DeWildt reported that he had been working with Plaintiff

21   on and off since November 2001.  (AR 339-40.)  He believed that she was an "enigma in many

22   ways."  Although she came across as sounding rational and capable, Mr. DeWildt believed Plaintiff

23   was in reality quite mentally ill with multiple diagnoses.  (AR at 339.)  First, Mr. DeWildt believed

24   Plaintiff to have bipolar I, mixed episodes diagnosis.  When she was manic, she participated in

25   political causes but then would crash under the weight of the responsibilities she took on.  During

26   her depression stages, she isolated herself in her bedroom for days, sometimes weeks at a time.  Mr.

27   DeWildt also believed Plaintiff to have severe obsessive-compulsive disorder.  She had bizarre

28   rituals related to food due to her fear of contamination.  She did not take many of her medications

because of this.  She also has to take a liquid Prozac, because she could not swallow the capsule form.  (*Id.*)  Mr. DeWildt also reported that Plaintiff had been diagnosed with panic disorder with agoraphobia.  When she was not manic, she isolated in her home and was unable to perform simple household tasks.  Mr. DeWildt believed Plaintiff's judgment and perceptions were impaired such that she was unable to seek or hold employment.  He reported that psychotherapy had not resulted in any kind of successful breakthrough of her symptoms.

The ALJ gives no reason for why he did not consider the opinion of a therapist who worked with Plaintiff over at least a one and a half year period.  While Mr. DeWildt was not a medical source, his opinion was still relevant in determining the severity of Plaintiff's condition and how her condition affected her ability to work.  Mr. DeWildt's treatment notes reflect periods of extreme depression and periods of manic activity on Plaintiff's part.  The ALJ, in his opinion, noted that Plaintiff had periods where she reported that her depressed mood was not as bad and that she was doing volunteer work.  (AR at 110.)  Mr. DeWildt's notes, however, provide insight into the fact that those periods could have been manic periods, in which Plaintiff took on too many responsibilities and when would crash under the weight of those responsibilities.  Therefore, those periods when things were "not as bad" could very well have been part of her illness.

The ALJ gives no reasoning for why he did not take Mr. DeWildt's treatment notes and opinions into account and yet took into account the opinions of the state agency medical consultants and the medical expert, none of whom ever spoke with Plaintiff or evaluated her.  In reviewing the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the ALJ's conclusions, the Court finds that the ALJ's decision is not supported by substantial evidence.  By discounting the opinions of her treating physician, an examining physician and a therapist, all of whom had more contact with Plaintiff than the consulting physicians, the ALJ committed legal error and ignored a substantial portion of the evidence in the record.[7]

---

[7]  Plaintiff also argues that the ALJ relied on vocational evidence that was inconsistent with the functional limitations he adopted. (Pl.'s Mem. 22.)  Specifically, Plaintiff contends that the ALJ found, among other limitations, that Plaintiff had *marked* difficulties in maintaining social function.  However, the hypothetical presented to the vocational expert cited *moderate* difficulties in social functioning, and the vocational expert based her opinions on a *moderate* limitation rather than a *marked* limitation.  The Court does not discuss this issue in detail, because it recommends reversal based on other grounds.  The

### 3.  Remand for award of benefits

Remand for further administrative proceedings is appropriate if enhancement of the record would be useful.  *Benecke v. Barnhart*, 379 F.3d 587 (9th Cir. 2004), citing *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000).  Conversely, where the record has been developed fully and further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits.  *Benecke*, 379 F.3d at 593 (citing *Smolen*, 80 F.3d at 1292).  More specifically, the district court should credit evidence that was rejected during the administrative process and remand for an immediate award of benefits if:  1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; 2) there are no outstanding issues that must be resolved before a determination of disability can be made; and 3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.  *Benecke*, 379 F.3d at 593 (citing *Harman*, 211 F.3d at 1178).

In this case, the Court finds that the *Harman* test is satisfied.  The ALJ did not provide legally sufficient reasons for rejecting the opinions of Dr. Alonso, Plaintiff's treating physician; Dr. Glassman, an examining physician; and Thomas DeWildt, a therapist.  Dr. Alonso and Mr. DeWildt's treatment notes explain the occasional periods where Plaintiff showed some improvement or took on volunteer work.  Further, the treatment notes and evaluations indicate that Plaintiff's failure to take her medication was a result of her mental condition.  Dr. Alonso believed that Plaintiff would have to miss more than three days a month of work due to her mental condition.  At the second administrative hearing, the vocational expert testified that if this were the case, Plaintiff would not be able to do any work.  (AR at 76.)  Therefore, it is clear from the record that the ALJ would be required to find Plaintiff disabled if he had properly credited Dr. Alonso's and Mr. DeWildt's opinions.

In *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1988), the Ninth Circuit found that

Court notes, however, that at the first administrative hearing, the ALJ's hypothetical to the vocational expert did cite a *marked*, and not *moderate*, limitation in social function, and the vocational expert indicated that Plaintiff could perform work as a cutter/paster and lens inserter. (AR at 111.) These were two jobs that the ALJ listed in his opinion that Plaintiff could perform. (AR at 19.) It does not appear that the *marked*, versus *moderate*, difficulty in social functioning had much of an impact on the vocational expert's opinion.

substantial evidence did not support the Secretary's findings because the ALJ did not provide specific reasons for disbelieving the treating physician.  Rather than remanding for further proceedings, the Ninth Circuit accepted the treating physician's opinion and ordered the payment of benefits.  *Id.*  In *Sprague*, 812 F.2d at 1230-32, the Ninth Circuit awarded benefits, because no legitimate reasons were given for disregarding the physician's opinion and the Secretary's decision was not supported by substantial evidence.  Similarly, in *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990), the Ninth Circuit awarded benefits when the Secretary did not provide legitimate reasons for disregarding the opinion of the treating physician and when there was "no legitimate conflicting testimony."  Accordingly, this Court finds that a remand for an award of benefits is proper in this instance.

## V.  Conclusion

After a thorough review of the record and the papers submitted and based on the reasons set forth above, this Court finds the ALJ's decision that Plaintiff could sustain jobs that constitute substantial gainful activity and that exist in significant numbers in the regional and national economies was not supported by substantial evidence in the record and was based on legal error.  Accordingly, this Court recommends Plaintiff's motion for summary judgment be **GRANTED** and the Commissioner's cross-motion for summary judgment be **DENIED**.  This Court further recommends that this case be **REMANDED** for an award of benefits.

This Report and Recommendation is submitted to the United States District Judge assigned to this case pursuant to 28 U.S.C. § 636(b)(1).  Any party may file written objections with the Court and serve a copy on all parties on or before **February 23, 2010**.  The document should be captioned "Objections to Report and Recommendation."  Any reply to the objections shall be filed and served on or before **March 2, 2010**.

**IT IS SO ORDERED.**

DATED:  February 9, 2010

_____
**CATHY ANN BENCIVENGO**
United States Magistrate Judge

- 28 -

08cv1584